[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE OF PROCEEDINGS:
On May 8, 1991, the Department of Children and Youth Services (DCYS) filed two petitions to terminate the parental rights of Rosemena H. (Rose) and Michael M. Sr., (Michael, Sr.) the CT Page 1449 biological parents of Michael Jr., and Maurice M., and a second petition as to a third son, Marcus M. alleging all four grounds pursuant to Section 17a-112 of the Connecticut General Statutes (C.G.S.) as follows:
 1. The child has been abandoned by the respondents in the sense that the respondents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
 2. The respondents were found in a prior proceeding to have neglected the child and have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the respondents could assume a responsible position in the life of the child.
 3. The child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being.
 4. There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of the respondents having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child.
The petitioners must prove at least one of the four grounds by clear and convincing evidence, which has existed for at least one year, unless waived by the court under Section 17a-112(c) C.G.S.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all rights and responsibilities, between the child and his parent or parents so that the child is free for adoption. . . ." Section 17a-93(e) of the Connecticut General Statutes. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 436 A.2d 290 (1980). "`Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children `undeniably warrants deference and, absent a powerful countervailing interest, protection."' In re Juvenile Appeal (Anonymous), 177 Conn. 648,671, 420 A.2d 875 (1979). The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. CT Page 1450 Section 17a-112(b) of the Connecticut General Statutes. In re Juvenile Appeal (84-BC), 194 Conn. 252, 255; In re Theresa S.,196 Conn. 18, 24, n. 5; In re Juvenile Appeal (83-BC), 189 Conn. 66,72; In re Juvenile Appeal (84-6), 2 Conn. App. 705, 708, cert. denied, 195 Conn. 801.
See also Santosky v. Kramer, 455 U.S. 745, 747-48. Section 1049 of the Connecticut Practice Book states: "The allegations of an application to terminate parental rights shall be proved by clear and convincing evidence." Clear and convincing evidence has been described as a level of proof that lies between the usual civil requirement of a fair preponderance of the evidence and the criminal standard of beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondents' rights as a parent should be ended. In re Juvenile Appeal (84-3),1 Conn. App. 463, 468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal (84-3), supra, 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Section 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254,259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine he validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition. The dispositional phase takes into account the best interest of the child, and the court is permitted to take into consideration events which had occurred after the filing of the petition to the time of trial.
The second ground DCYS alleged for termination was that these parents failed to personally rehabilitate their lives within a reasonable time, but not less than a year, from the time these three children were committed to DCYS. The court must also consider the age and needs of each child and whether they could assume a responsible position in their lives within a reasonable time based on the testimony at trial and the record on file. What is a reasonable time, and what are the needs of the child, are issues of fact for the court to decide in each particular case, In re Shannon S., 19 Conn. 20 (1989) and In re Luis C. 210 Conn. 157
(1989). Each of these three children has a vital interest to develop their life to it's fullest potential within a reasonable time and is equal to giving the parent's right to rehabilitate in CT Page 1451 order to be reunited to their child. In re Rayna. M. 13 Conn. App. 23
(1987).
In the cases of Michael and Maurice, DCYS obtained an order of temporary custody on June 10, 1988, and they were placed in the same foster home on June 15, 1988. They were adjudicated neglected and uncared for on February 23, 1989, or about twenty-six months to the date the termination petition was filed on May 8, 1991. But they both have been in Foster care under the custody of DCYS for over thirty-five months, and it is over this thirty five month period of time that DCYS has been working to rehabilitate them.
As to Marcus, he was adjudicated, neglected and uncared for on April 7, 1989, the filing of this termination on May 8, 1991 is over twenty-five months. DCYS had previously obtained an Order of Temporary Custody February 18, 1989 ten days after he was born, and he has been in foster care about twenty-seven months.
Adjudicatory Phase:
The court will consider the relevant and material evidence and make findings of fact from the date that DCYS obtained custody of each child to the date these two termination petitions were filed on May 8, 1991. Further findings of fact will be made in the dispositive phase of this decision.
From the testimony of the DCYS social worker, Ms. Jean Morse, and from the social studies she prepared, and the reports in the file that the court has taken judicial notice of, and the testimony of the parent aide, the court makes the following conclusions of fact relative to the respondent mother.
1. Shortly after her first son Michael was born on November 128, 1985 the Norwalk hospital social worker referred her to a drug treatment program. DCYS also assigned a parent aide to help her parent this first child. Even though DCYS provided transportation, she refused to attend drug counseling meetings. She also did not cooperate with the parent aide, therefore, her case was closed on March 6, 1986.
2. On June 23, 1987, her second son Maurice was born and he also had serious drug withdrawal symptoms. Again, the Norwalk hospital social worker referred her to a drug treatment program. She first agreed to participate, but later dropped out.
Rose agreed to attend another drug support group in June 1987, but then failed to attend at least seven meetings. Again, DCYS had arranged transportation for her. In January, 1988, Dr. Jorge Elias informed DCYS that she had not brought Michael and CT Page 1452 Maurice for their immunizations shots, nor to treat Michael for his anemia. She refused to take them, even after the agency arranged to transport them. She failed to keep five appointments with Dr. Elias from February to June, 1988, whereby Judge Thim ordered them to be medically treated on June 10, 1988.
On February 21, 1989, she gave birth to Marcus her third son, and again admitted to the social worker at the Norwalk Hospital that he had been using cocaine the day prior to delivery and during her pregnancy. Marcus displayed signs of drug withdrawal, which continued for three months. He was jittery and had to be tightly wrapped in a blanket. He would shake so much that his crib would move, required feedings every hour, and was diagnosed as microcephalic and considered to be a failure to thrive baby. Marcus was the third child that Rose had in four years who was born with serious medical problems caused by her drug use.
Even though Rose refused to complete two previous drug programs, on June 7, 1989, DCYS arranged DCYS arranged for her to enter a third program as an inpatient, Renaissance of Waterbury. Four months later, on October 27, 1989, she was discharged for lack of motivation. In January 1990, she agreed to attend an outpatient drug program at Norwalk Hospital but failed to even enroll. During the next four months, her whereabouts were unknown to DCYS, and later the social worker learned she had gone south to visit relatives. The father was told that unless service agreements were signed by both of them and conditions of rehabilitation met, termination petitions would be filed on the three children. Rose never made herself available, but on May 19, 1990, the father signed an agreement that he would secure suitable housing, develop a financial resource plan to support his three children, and visit them on week-ends to establish a parent-child relationship.
On July 10, 1990 DCYS received a fourth referral from the Norwalk Hospital social worker that Rose gave birth to a fourth son, Miles M. He tested positive for cocaine and had serious respiratory problems. On his discharge from the hospital on August 23, 1990, DCYS assigned a parent aide to assist her with this child. Again she was to address her drug problem, and DCYS made transportation available through a parent aide to reopen visitation with her other three sons at their foster homes in Bridgeport and Stratford. The parent aide testified that this Rose failed to attend the drug program and never once requested a visit with her three children. The evidence that this mother was using drugs began before her first son Michael was born on November 28, 1985. He and his brothers, Maurice and Marcus, were all born with drug withdrawal symptoms.
Her fourth son, Miles, born on July 7, 1990 also tested CT Page 1453 positive for cocaine. Over these past five years, DCYS has made numerous attempts to provide transportation for her to attend drug programs she either refused or was discharged for non-attendance. The evidence that she was unable to rehabilitate her addiction to drugs for the past five years was proven beyond a reasonable doubt. Because of her addiction, she has been and is now unable to provide for the basic needs of her three children. It has been over three years that Michael, Maurice and Marcus have been adjudicated neglected and uncared for by this court, and she has been unwilling and unable to overcome her drug addiction. She chose to continue taking drugs during all three pregnancies whereby, all three children were born with drugs in their blood. The evidence is clear and convincing, in fact overwhelming, that DCYS has proven this ground of her failure to personally rehabilitate, and the court so finds.
As to the father, he appeared on the first date of trial, July 16, 1991, under prison guard. He was serving a four and one-half year sentence on a conviction for the sale of narcotics and fraud. (See State's Criminal Record Exhibit A). From November, 1989 to May, 1991, this Exhibit A listed four felony convictions including assault, possession of narcotics, violation of probation, sale of narcotics and forgery. He was released on parole in December 1991, but re-arrested January 1992, when he again appeared on January 6, 1992 under prison guard for the continued trial.
He is the admitted father of Michael, Maurice and Marcus, as well as the two other sons Miles born on July 10, 1990 and Marlon born September 4, 1991. He had known Rose for over ten years, having met in Norwalk high school. They never married nor has he ever provided a home for her or these children. By his own testimony, he had lived with his sister in Stamford and with an aunt in Norwalk before going to jail in March 1991. He never has been able to rent his own apartment nor find housing for himself, let alone these children. In the last service agreement he signed with DCYS on May 18, 1990, again agreed to provide housing as he had may other times since 1987. Because of his criminal record he failed to qualify for either public or private housing. His criminal activities made it difficult to maintain a steady job even though he had graduated from high school and had developed skills in computer science and was employable. But he chose a life-style that led him to prison whereby he failed to comply with any DCYS service agreements. He was dependent on his relatives for housing, and his own personal needs, let alone provide for his children. In his testimony he expressed the intention to obtain housing after his release from prison. But during the past six years, he has never provided it, and gave them only minimal financial support. He will be on parole until 1994. More than twenty-seven months have passed since Michael and CT Page 1454 Maurice were adjudicated neglected and twenty-six months as to Marcus, which is more than twice the one year required by Section17a-112 C.G.S. to rehabilitate. Instead of reforming his behavior, he was convicted and sentenced in February 1991 to four the and one-half years jail term he is now serving. He presented no evidence to encourage the belief that he could assume within a reasonable time a responsible position in the lives of these three children. Again, DCYS has proven, and the court finds by clear and convincing evidence that this father has failed to rehabilitate within a reasonable time within the meaning of Section 17-112(2). In fact, the evidence was more than the required standard.
Upon adjudication on this ground of failure to rehabilitate, In re Shavoughn K., 13 Conn. App. 91 (1987), requires the court to make findings on the six factors in Section 17a-112 C.G.S.(d) as of May 8, 1991, the date these petitions were filed. The findings are as follows:
1. DCYS offered Rose at least three drug programs, even providing her transportation for attending them. A parent aide was assigned to assist her parent these three children. Norwalk Hospital urged her to attend a drug rehabilitation program after each of them were born. She failed to attend them in December of 1985, 1987 and 1990. She also was discharged from the Renaissance Inpatient Program of Waterbury in June, 1989, for failure to comply with the requirements of treatment. During this five and one-half year period, she has been unwilling or unable to reform her drug addiction.
The father signed services agreements with DCYS agreeing to secure suitable housing, develop a financial plan to support these children, and visit weekends with them, the last was signed on May 18, 1990. He has never complied with the requirement of housing nor found a steady job to support them. Their unlimited visitation rights have been sporadic during this same period. Since Michael and Maurice were committed on February 23, 1989, they visited them three times in 1988; twelve in 1989; nine times in 1990. They never even requested a visit with them from December 26, 1990 to May 9, 1991, when the termination petitions were filed. DCYS has held at least five administrative starting in January 1987, and notified both parents that plans for reunification would be addressed. As to Michael and Maurice, neither parent attended any of these review hearings, and as to Marcus, the mother attended two out of five, and the father none. They visited Marcus five times in 1989, four times in 1990, and neither parent had requested a visit from December 26, 1990 to May 9, 1991.
2. There were no court orders entered. All service CT Page 1455 agreements were entered into with DCYS, and as above stated, both parents failed to comply with the terms agreed to for reunification.
3. Michael and Maurice have been with the same foster parent since June 15, 1988, or about three years to May 8, 1991. Marcus has been with the other foster parent since he was born and about twenty-five months from the time he was adjudicated a neglected child. All three children are bonded to their respective foster parents with whom each child has developed a strong and significant emotional tie.
4. Michael was born on November 28, 1985; Maurice on June 22, 1987, and Marcus on February 18, 1989.
5. Neither parent has adjusted their respective circumstances, conduct or conditions so that it would be in the best interest of these three children to be returned to them, or to one of them, in the foreseeable future. The mother has been using drugs for over five years and one-half years and has never been able to overcome her addiction. She has always been on public assistance, unable to hold a job, or provide a home for them. The father has also had no home for them and never was able to develop a plan to support them. He has been incarcerated for a number of felony convictions and will be on parole until 1994. The sporadic pattern they both followed in taking advantage of the unlimited visitations, indicated a lack of interest in reunification.
6. Neither parent nor DCYS prevented the other parent from maintaining a meaningful relationship with the children. Clear and convincing evidence established that they lacked the will or desire to reform their own inadequacies. The primary cause was the mother's continual use of drugs, and as to the father's, his criminal activities, rather than economic circumstances caused the breakdown. Economic hardship may be a contributing cause for this lack of a meaningful relationship by these parents, it was not a compelling cause or reason.
From the court's general findings and its specific findings on the above six factors, all of which are based on clear and convincing evidence, the petitioner DCYS has proved the second ground for termination.
The first ground alleged by DCYS was abandonment, which is defined in Section 17a-112(b)(1) as a parent's failure "to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. . . ." This definition changed the common law concept of abandonment when a permanent and total intent to abandon had to be proved. Litvaitis CT Page 1456 v. Litvaitis, 162 Conn. 540, 547. In the case of In re Juvenile App. (Docket No. 9489), 183 Conn. 11, 14, 15 (1981), the Supreme Court stated that the focus to be considered is parental conduct, which is a question of fact for the trial court. In re Rayna. M., 13 Conn. App. 23. "The statutory standard is not whether the parents have shown some interest in their children. Common sense dictates that a parent's obligations toward his or her children go farther than a minimal interest. . . .'The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance."' In re Rayna M., supra, 36, 37. Both parents at various times during the past three years have expressed love and affection for these children in words and during visitations. But they have not fulfilled the other requirements that involved acts or conduct that speak so much louder than words when it comes to meeting the daily needs of these three children. They both failed to meet the other four minimal requirements as required by In re Rayna M., supra, 37, as outlined above.
At best, their efforts were minimal to maintaining interest as to the welfare of these three children. They did not come close to meeting the statutory test of giving them a reasonable amount of care, concern, or responsibility
These parents had unlimited rights of visitation for Michael land Maurice at the foster home in Stratford where they were living since June 15, 1988. From that date, to the end of 1988, they visited them three times; in 1989 twelve times, in 1990 nine times. (see social study dated May 8, 1991). The visitations were inconsistent during the three years from June 1988 to May 8, 1991, when the petitions and social studies were filed. For example, a visit was scheduled for May 13, 1989, for the father to assemble a swing set that the foster mother had purchased for Michael and Maurice to improve their motors skills. But he never appeared nor telephoned the foster mother that he could not make it. On Thanksgiving, November 22, 1990 the parents appeared to take the two children on an overnight stay. But they failed to arranged it in advance, whereby the children were not allowed that visit by the foster mother. They requested a visit on December 20, 1990 but never came nor called to cancel it. Neither parent requested a visit with Michael or Maurice from December 26, 1990 to May 8, 1991 when the termination petition was filed, even though DCYS would pay transportation costs and the parent aide was willing to drive them during part of this period. Since January 17, 1989 the father failed to attend the six month CT Page 1457 administrative reviews at DCYS, and the mother never attended any reviews for the past three years even though they both were told by the social worker the importance of attending them. Neither parent has acknowledged their birthdays during these past three years by sending a card or telephoning them.
As to Marcus, who has been in a foster home in Bridgeport where he has lived since February 28, 1989, almost three years, his entire life, except for the first ten days. They also had unlimited visitation rights with him as long as they called the foster mother in advance. In the ten months in 1989, they visited him a total of five times, and four times in 1990. Their last visit was December 26, 1990. The parent aide provided by DCYS was willing to drive them for visitations, but none were requested after December 26, 1990, to the date the termination petition was filed. The father had not attended any of the six month administrative reviews of the DCYS treatment plans and the mother only two out of five, even though the social worker advised them of the dates and the importance of attending. Neither parent has shared a holiday visit with Marcus since Thanksgiving of 1989, nor did they acknowledge his birthday of February 18, 1991.
These parents showed a sporadic display of interest or concern in visiting with their three children and to attending the DCYS administrative reviews to know the expectations for reunification. They showed a minimal interest and concern or responsibility for the welfare of their children, which falls far below the statutory standard. In re Rayna M., supra, pg. 37. The court finds that the evidence was clear and convincing that these respondent parents have abandoned Michael, Maurice, and Marcus under Section 17a-112(1), C.G.S. The prior findings of fact made by the court on the failure to rehabilitate ground also apply to this abandonment ground. In re Shannon S. et al, 19 Conn. 20
(1989).
The third ground alleged by DCYS for termination is that by reason of an act or acts of parental commission or omission, a child has been denied the care, custody or control necessary for her or his physical, educational, moral, or emotional well-being. Section 17a-112(b)(3), C.G.S. As previously stated, DCYS can rely on the same acts of parental omission or commission that supported the grounds of failure to rehabilitate and abandonment. As to the mother, she admitted taking drugs before and during each of the pregnancies of these three children, and urine tests were positive after each birth. All three children suffered serious drug withdrawal symptoms. All three children were born anemic, with severe developmental delays. They all were enrolled in special rehabilitative programs. Marcus was so jittery and sweaty at birth that he had to be tightly wrapped in a blanket. He would shake so much at night, that his crib would move. He was CT Page 1458 suffering from physical illness from the date these birth and was placed directly into foster care from the hospital. The court finds by clear and convincing evidence that her continuous drug addiction was the direct cause of the physical and emotional defects that effected Michael, Maurice and Marcus and continued to the date these petitions were filed. The fact that Michael and Maurice have been in foster care for over two years, nor the fact that Michael was about two years and 6 months old and Maurice was about one year old when he was placed, does not diminish the physical and emotional handicaps inflicted on them by her taking drugs. The fact that Marcus was placed in foster care ten days after he was born doesn't change or mitigate his physical and emotional handicaps. All were caused by the mother's addiction to drugs that continued for over five and one-half years from November 1985 to May, 1991 when these petitions were filed. In re Valeri D., 25 Conn. App. 586 (1991).
As to the father, there was no showing by clear and convincing evidence that his felony convictions and failure to provide housing or support for then affected the well-being of the three children in any of the four ways specified under this ground. Therefore, DCYS did not prove this third ground as to him.
The fourth ground alleged by DCYS, the absence of an ongoing parent-child relationship, a two-prong test must be met.
Clear and convincing evidence must demonstrate the absence of a relationship "that ordinarily develops as a result of a parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child." Thereafter, clear and convincing evidence must also demonstrate that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The absence of a parent-child relationship can be demonstrated in situations where a child has never known her parents so that no relationship ever developed between them or where the child has lost that relationship so that despite its former existence, it has now been completely displaced. In re Juvenile Appeal (Anonymous) v. Commissioner of Children and Youth Services, 177 Conn. 648, 670 (1979). Proof of a lost or displaced relationship depends upon whether a child has specific memories of or positive feelings for the natural parents. In re James T., 9 Conn. App. 608, 616 (1987); In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709 (1984), cert. denied, 195 Conn. 801
(1985). The existence of positive feelings depends on the viewpoint of the child. In re Rayna, supra, 13 Conn. App. pg. 35. CT Page 1459
The existence of some contact between the parent and child does not preclude a finding that there has been no on-going relationship for more than a year. In re Juvenile Appeal (Anonymous, 181 Conn. 638, 646 (1990).
Michael and Maurice have been in foster care since June 15, 1988, or about thirty-five months, and Marcus since February 28, 1989, or about twenty-six months, to May 8, 1991, when both termination petitions were filed. Based on the social study filed with these petitions, and the testimony of Ms. Morse, the DCYS social worker that prepaid the study, the court finds those facts found on the prior grounds of failure to rehabilitate and abandonment applicable and relevant to this ground.
Even though these parents had unlimited rights of visitation with all three children, and DCYS had agreed to reimburse them for transportation costs for the visits, when a parent aide had not been assigned, there four times they visited has been previously stated in this opinion Because these visits were so sporadic, Michael refers to his mother as "Rose" and to his foster mother as "mommy". Maurice also refers to this foster mother as "mommy". They both were upset after these visits and Maurice frequently cried. Michael reverted to bed wetting and messing his pants, broke toys they had bought him, and tore up his father's photographs. Marcus has been in foster care all his life, except for the first ten days. He suffered withdrawal delays from drugs at birth and later serious developmental delays requiring special care. Neither parent has consistently inquired as to his rehabilitative progress during the past two years. A IDA development assessment referred to his "wonderful attachment to his foster parents", is extremely bonded to them, and calls them "mommy" and "poppy". With a total of nine visits with him, Marcus shows minimal response of emotional feelings towards these respondents.
The court finds that these facts have established by clear and convincing evidence that no on-going child parent relationship ever developed with Marcus, and that whatever positive feelings Michael and Maurice had for them has been displaced. Their feelings and memories towards them are negative. From the time Michael, Maurice, and Marcus were placed in foster care, there was a lack of interest and disregard for the physical, emotional, moral and educational needs of each child. Therefore, DCYS has met the first part of the test by clear and convincing evidence. In regard to the second prong, the court must look to the future and decide whether the allowance of additional time for the development of a parent-child relationship would be in the best interests of these three children. From the facts presented at trial, both parents have regressed, or moved backward instead of forward, in reforming CT Page 1460 their lives. With this background, and the length of time that DCYS has allowed for these parents to change, the evidence is clear and convincing that any further delay for a parent-child relationship to develop would be contrary to the best interests of these three children.
Disposition — from May 8, 1991, to February 7, 1992
DCYS has met the burden of proof on the statutory grounds for termination, but now the court must consider disposition. Proof of one or more of these grounds does not automatically terminate parental rights. In re Juvenile Appeal, 189 Conn. 66, 79 (1987). To terminate them, the court must also find by clear and convincing evidence that it would be in the best interests of these three children. In re Nicolina T., 9 Conn. 598. As the court has previously stated, additional facts and events that took place from when the petitions were filed on May 8, 1991, to the end of the trial on February 6, 1992, can now be considered. According to the testimony of Ms. Morse, and as stated in her social study, both Michael and Maurice told her on November 18, 1991 that they wanted to stay with their foster mother permanently. And she testified and the court finds that Marcus does not even recognize them as his parents. He has seen him only eight times since February 28, 1989, about twenty-four hours, in the past thirty-five months. On December 6, 1991, after the trial had been in progress for six months, the father's attorney moved the court for a psychological evaluation of Michael since he believed that there was a potential to reestablish a parent/child relationship with him. Even though the motion was untimely, the court granted his request, and on January 15, 1992, Michael was interviewed by Dr. Paul F. Turner, a licensed clinical psychologist. His reports were filed with the court on January 27 and 28, 1992. (See Court's Exhibit 1). Michael's answers were clear and unequivocal that he did not want to be returned to his natural parents but wanted to remain with his foster mother. His answers established his desires beyond any reasonable doubt.
Dr.: "How are you feeling this morning?
Michael: "Bad."
Dr.: "Why?"
 Michael: "Because Dad didn't visit me on my birthday or Christmas."
Dr.: "Was he supposed to?"
Michael: "He got in jail." CT Page 1461
— — — — — — — — — — — — — — — — — — — — — — — — — — — — —
Dr.: "Who owns the house you live in?"
Michael: "Martha Ann Vereen . . . Mon."
— — — — — — — — — — — — — — — — — — — — — — — — — — — — —
Dr.: "Can Rose and Michael take care of you?"
Michael: "Nope."
Dr.: "Why not?"
Michael: "They always keep doing drugs."
Dr.: "Can Rose and Michael learn to take care of you?"
Michael: "Mnn Mnn (No)"
Dr.: "Why?"
Michael: "Cuz. . ."
Dr.: "Do you want Rose and Michael to take care of you?"
Michael: "I'm going to say no."
Dr.: "Do you want Rose and Michael to see you?"
Michael: "Nope. . .Say no."
Dr.: "Do you want to see them any more?:
Michael: "Nope."
Dr.: "Who do you want to stay with?:
Michael: "I want to stay at Mrs. Vereen's house."
— — — — — — — — — — — — — — — — — — — — — — — — — — — — —
 Michael: "Dear Judge . . . Michael wants to stay at Mrs. Vereen's house." "Write; `Judge, Michael wants to stay with Martha."'
 Dr. Turner concluded with this statement: "Michael's verbal and nonverbal expressions indicate that he considers his foster mother to be the adult most CT Page 1462 competent to care for his basic physical and emotional needs. He clearly wants to remain securely placed in her household."
This evaluation by Dr. Turner that the father requested and that the court allowed can be given great weight as an expert opinion of a licensed clinician. In re Nocolina T., supra, pg. 605.
There were ten days of trial from July 16, 1991 to February 7, 1992, and the mother attended all of them except the last day when she was to testify. On that date, she failed to appear in court and her attorney told the court she was too embarrassed and choose not to appear.
The court has previously made the six findings required under Section 17a-112(d) C.G.S. up to when the petitions were filed on May 8, 1991, in compliance with In re Shavoughn K. The finding listed below are limited from the filing date to the end of the trial.
1. DCYS continued to provide visitations but these parents only visited them three times from May 8, 1991 to the end of that year, and cancelled a number of scheduled visits without any valid reasons.
2. The only other court order was a parent/child evaluation on December 6, 1991, which was performed by Dr. Paul F. Turner and filed on January 27 and 28, 1992, which the court has previously discussed. His conclusion and opinion as to Michael was probative and compelling and is accepted by the court.
3. The three children have no positive feelings or emotional ties for these respondent parents. The foster mother is the psychological parent for Michael and Maurice and Marcus is also bonded to his foster parents. Their emotional ties and feelings are with these foster parents. Michael and Maurice have been with this same foster parent for about three years and eight months and Marcus with his foster parents for over thirty-five months.
4. At the end of the trial on February 7, 1992, Michael was six years and two months; (born November 28, 1985); Maurice was three year and eight months (born June 22, 1987) and Marcus was almost three years old (born February 18, 1989).
5. The parents regressed in reforming their lives between filing the petitions and the end of the trial as the court has found in the dispositive phase of this decision. It would not be in the best interests of any of these three children to consider returning them to these respondents in the foreseeable future. CT Page 1463
6. Neither parent nor DCYS prevented the other parent from enjoying a meaningful relationship with the three children. It was their own inadequacies rather than any economic hardships that caused the lack of any meaningful relationship.
The youngest child, Marcus, has been committed to foster care for almost three years, and Michael and Maurice even longer. From all the evidence presented, the court believes it may have been in the best interests of these children for DCYS to have proceeded at least a year sooner with these petitions. But there was no evidence presented that either of them was prevented by any person or agency to maintain a meaningful relationship with them.
Taking all required factors into account, the court concludes that the requested termination of parental rights has been proven by clear and convincing evidence to be in the best interest of these three children. A termination is therefore ordered of the parental rights of Rose H. and Michael M. Sr., in and to their minor children Michael, Maurice, and Marcus.
Pursuant to General Statutes Section 17a-112(i), it is further ordered that the Commissioner of DCYS be appointed statutory parent so that Michael, Maurice and Marcus can be placed in adoption. DCYS is required to submit reports to the Clerk of the Court within 390 days of the date of this judgment and annually thereafter until the adoptions of Michael, Maurice and Marcus are finalized.
Entered at Norwalk this 19th day of February, 1992.
PETRONI, J.